# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# HELENA DIVISION

================================================================

Case No. MJ-10-6-H-RMH

UNITED STATES OF AMERICA,

                    Plaintiff,

versus

SHAWN MATTHEW RUSSELL,

                    Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# TRANSCRIPT OF ELECTRONIC PROCEEDINGS

Preliminary and Detention Hearing
United States District Court
Paul G. Hatfield Courthouse
901 Front Street
Helena, MT  59601
**August 24, 2010**

# Magistrate Judge Robert M. Holter, Presiding

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Julie L. Sampson*
*Court Reporter*
*For The Record Reporting Services*
*PO Box 176*
*Butte, Montana  59703*
*(406) 498-3941*

<u>**APPEARANCE OF COUNSEL:**</u>

**For the Plaintiff:**

Mr. Brian Whitaker
Assistant United States Attorney
U.S. Attorney's Office
PO Box 1478
Billings, Montana  59103-1478
(406) 247-4631 (Phone)
(406) 657-6058 (Fax)

**For the Defendant:**

Mr. Michael Donahoe
Federal Defenders of Montana
Helena Branch
PO Box 250
Helena, Montana  59807-9380
(406) 449-8381 (Phone)
(406) 449-5651 (Fax)
michael_donahoe@fd.org

**Also Present:**

USPO J.R. Waller

1                     <u>INDEX:</u>

2    <u>**WITNESS:**</u>                                    <u>**PAGE:**</u>

3
     <u>DETECTIVE BRIAN FISCHER</u>
4
     Direct Examination by Mr. Whitaker . . . . .       5
5    Cross-Examination by Mr. Donahoe . . . . . .      18
     Redirect Examination by Mr. Whitaker . . . .      25
6
7    <u>BARBARA TODD</u>

8    Direct Examination by Mr. Donahoe. . . . . .      28
     Cross-Examination by Mr. Whitaker. . . . . .      38
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>**PROCEEDINGS**</u>

2

3              **(The proceedings began at 9:45 a.m.)**

4

5              THE BAILIFF:  All rise.  United States

6      District Court in and for the District of Montana

7      is now in session, the Honorable Robert M. Holter,

8      presiding.

9              THE COURT:  Be seated, please.  Good

10     morning.

11              MR. WHITAKER:  Morning, Your Honor.

12              MR. DONAHOE:  Morning, Your Honor.

13              CLERK OF COURT:  Today we are hearing the

14     Helena case number.  This is time set down for the

15     preliminary hearing and detention hearing in

16     Criminal Cause MJ-10-6-H-RMH, USA versus Shawn

17     Matthew Russell.

18              THE COURT:  Let's see.  You're Shawn

19     Matthew Russell; is that correct?

20              THE DEFENDANT:  Yes, Your Honor.

21              THE COURT:  Counsel, do you represent

22     him?

23              MR. DONAHOE:  I do, Your Honor.

24              THE COURT:  Yeah.  The Government ready

25     to proceed with the preliminary hearing?

1          MR. WHITAKER:  Government is ready, Your

2     Honor.

3          THE COURT:  The Defendant?

4          MR. DONAHOE:  We are.

5          THE COURT:  Be seated, please.

6          MR. WHITAKER:  The Government would call

7     Brian Fischer.

8

9                    **BRIAN FISHER,**

10     **having been first duly sworn, testified under oath**

11  **as follows:**

12          THE WITNESS:  I do.

13          CLERK OF COURT:  Please state your full

14     name and spell your last name.

15          THE WITNESS:  Brian David Fischer,

16     F-I-S-C-H-E-R.

17          CLERK OF COURT:  Go ahead and take a seat

18     in the witness stand and speak clearly into the

19     microphone.

20

21                  **DIRECT EXAMINATION**

22  **BY MR. WHITAKER:**

23     **Q.   Good morning, Mr. Fischer.**

24     A.   Good morning.

25     **Q.   Can you please tell the Court how you are**

1  presently employed?

2      A.    Certainly.  I'm a Detective with the Helena

3  Police Department assigned to the Montana Internet

4  Crimes Against Children Task Force.

5      **Q.    And just could you briefly describe some of**

6  **the duties of your employment?**

7      A.    Certainly.  I investigate complaints and

8  crimes involving the sexual exploitation of children via

9  any technology-based means, which can include

10  peer-to-peer investigations for child pornography, as

11  well as any type of enticement or sexual exploitation of

12  a child under the age of 18 via chat rooms, things of

13  that nature.

14      **Q.    And how long have you been employed in your**

15  **present duties?**

16      A.    For three years, but I've been a law

17  enforcement officer for over 20.

18      **Q.    And have you had cases in the past to**

19  **investigate child exploitation cases as you've**

20  **described?**

21      A.    Yes, I have.

22      **Q.    And have you had training in how to**

23  **investigate those types of crimes?**

24      A.    Yes, I have.

25      **Q.    And briefly describe what kind of training**

1    you've had.

2        A.    Certainly.  Through the National Internet

3    Crimes Against Children Task Force they have -- which is

4    through Fox Valley Technical College, I've had basic

5    undercover chat investigations.  I've been involved in

6    peer-to-peer investigations.  I've had numerous child

7    abuse, child sexual abuse investigation classes.  I have

8    been taught in the latest techniques and tools via

9    Internet investigations pertaining to, for example,

10   Facebook, My Space, other chat rooms that are on the

11   Internet and continue to receive that training.

12       **Q.    As part of your duties as an investigator, did**

13   **you participate in the investigation of an individual**

14   **that is the subject of this case, Mr. Shawn Matthew**

15   **Russell?**

16       A.    Yes.

17       **Q.    Could you describe for the Court how you first**

18   **became aware of this investigation.**

19       A.    Certainly.  In June of 2010 I received a phone

20   call from Detective Jim Littlefield with the Pendleton

21   Oregon Police Department who indicated that he needed

22   assistance in regards to an investigation in which there

23   was a report of a 15-year-old girl that may have been

24   taken from Pendleton, Oregon in December of 2009 by

25   Mr. Russell and they engaged in sex while traveling from

1      Oregon to Washington to Montana.  And that the -- Mr.

2      Russell had met the 15-year-old girl in roughly

3      September of 2009 via the Internet, and they

4      communicated via the Internet, as well as webcam and by

5      cellphone.

6          Q.   And are you aware of the nature of those

7      initial communications, as you've just described, that

8      Mr. Russell had with the underage female?

9          A.   According to a statement that was taken from

10     the female, I was aware of the conversations that took

11     place.

12         Q.   Are you aware of any time during those

13     conversations whether Mr. Russell was aware of the

14     victim's age?

15         A.   I believe on a couple of occasions there was

16     -- the victim in this particular case indicated she was

17     15 to Mr. Russell.  The mother apparently had talked to

18     Mr. Russell via webcam to say that her daughter was too

19     young for Mr. Russell to be involved with, as well as

20     there was some recovered chat messages in which

21     Mr. Russell acknowledged that he knew that she was 15

22     and wished that he would have waited until she was 16 to

23     engage in a relationship with the victim.

24         Q.   Now, you mentioned that he traveled to Oregon.

25     Do you -- are you aware of what happened when he arrived

1    at Oregon?

2        A.    I am.  I am aware that he had waited for the

3    victim to leave her mother's home, got into the vehicle

4    with Mr. Russell.  They traveled to a motel in

5    Pendleton, Oregon where the victim claims that the two

6    engaged in sexual intercourse.  The following day, the

7    two then mutually agreed to leave Oregon and be

8    together, and they went to the Walla

9    Walla/Pascoe/Kennewick, Washington area where they also

10   spent another evening in a motel where they engaged in

11   sexual intercourse, and then traveled to Montana staying

12   in Missoula one night, and the two had engaged in sexual

13   intercourse in a motel there, and then traveled to

14   Helena where they spent two nights at the Shilo Inn and

15   engaged in sexual intercourse.

16       Q.    During your investigation were you able to

17   confirm independently any of the information that was

18   provided to you by the victim?

19       A.    Yes.  There was a police officer in Pendleton,

20   Oregon that had gone to the Red Lion Hotel and found and

21   verified that Mr. Russell had used a Visa card and was

22   able to receive the last four digits of that Visa card

23   to show for payment that he had stayed there.  I had

24   personally gone to the Shilo Inn and received a

25   registration card, as well as the payment folio that

1    showed Mr. Russell had spent two nights in Helena.

2        Q.   And are you familiar with the affidavit that

3    you submitted in this case?

4        A.   Yes, I am.

5        Q.   And I would ask you if you would read -- if it

6    would be your position that you would readopt the same

7    facts as alleged in that affidavit for the purposes of

8    this proceeding?  Is -- everything that you had

9    submitted to the Court in that affidavit, is that still

10   true and accurate and correct?

11       A.   Yes, it is.

12       Q.   And as part of that affidavit you had

13   indicated that it's a crime in Montana to have sexual

14   intercourse without consent as a violation of Montana

15   Code 45-5-503?

16       A.   That is correct.

17       Q.   And briefly, what is that underlying offense

18   that you referred to in your criminal complaint and

19   affidavit?

20       A.   In the state of Montana it's illegal for -- or

21   a child under the age of 16 is unable to engage or give

22   consent to engage in sexual intercourse.

23       Q.   So is it your understanding that it would be a

24   crime in Montana for an adult male to engage in sexual

25   intercourse with a minor under the age of 16?

1     A.   That is correct.

2     Q.   During your investigation, did you learn about

3   any chats that the -- or communications, chats that the

4   Defendant may have had with the victim or the victim's

5   family or friends after the incidents that you have

6   described that occurred in December?

7     A.   Yes.

8     Q.   Have you been able to review -- what kind of

9   communications were those?

10     A.   They looked like they could be chat postings

11   or there was chat communication back and forth.  It

12   looks like it may be some other type of communication,

13   but they were apparently delivered from the victim in

14   this case to the police department and forwarded on to

15   me to say that those were the communications between

16   Mr. Russell and the victim.

17     Q.   And have you had an opportunity to review

18   those communications?

19     A.   Yes, I have.

20     Q.   Now, you've indicated that you thought these

21   communications were between the Defendant and the

22   victim, was that -- was it the victim's, I guess, screen

23   name that was being used?

24     A.   Yes, it was.

25     Q.   Are you aware of maybe possibly whether there

1    was another individual using the victim's screen name at

2    that point?

3        A.    There was at one particular point.    The

4    victim's former boyfriend had also been using that

5    particular screen name.

6        Q.    I want to refer you, if I could, to -- well,

7    let me ask you.    Was there a chat that occurred on March

8    9th of 2010?

9        A.    Yes, there was.

10       Q.    Did you bring that chat with you to court

11   today?

12       A.    I did, yes.

13       Q.    And do you have that in front of you?

14       A.    I do.

15       Q.    I want to refer your attention to that chat,

16   if I might, and refer you to the bottom of Page 7 of

17   that chat.

18       A.    Certainly.

19       Q.    Could you just generally describe for the

20   Court what is occurring, starting at the bottom of that

21   page and continuing over on to Page 8?

22       A.    Certainly.    What had taken place is is that

23   the communication was between the victim's screen name,

24   in which the victim's new boyfriend had been

25   communicating with Mr. Russell's screen name, and in the

1    process they talked about the relationship.  They talked

2    about the legality of it, that it wasn't a legal act

3    that Mr. Russell had engaged in.  And in the process,

4    Mr. Russell had made some comments about how he wanted

5    to, instead of being taken into custody for his illegal

6    activity, that getting gunned down by the cops would be

7    preferable.

8        **Q.   Why did he say that being gunned down by the**

9    **cops would be preferable?**

10       A.   He apparently had some type of a medical

11   condition that, if the medical condition were to act up,

12   he did not want to go in that fashion.  He also talked

13   about that he did not want to take his own life, that

14   that would be no fun and that it would be a lot more fun

15   if law enforcement would take him out.

16       **Q.   During your investigation did you review any**

17   **web pages that belonged to Mr. Russell?**

18       A.   I did.

19       **Q.   What web pages did you review?**

20       A.   Mr. Russell had a My Space profile, and on the

21   My Space profile you can post information about how

22   you're feeling or what your thought process may be or

23   just post information.  And in that particular case, he

24   talked about how, if you wanted somebody shot, that he

25   would be the person to be able to do that and he charged

1    less than his other competitors.  He also mentioned that

2    he was trigger happy under a -- basically it's called a

3    smilicon is what it's called, it kind of gives the

4    thought process or how you're feeling at that particular

5    point, and it stated that he was trigger happy.

6         Q.   And when was that posting made?

7         A.   If I remember correctly, it was the 16th of

8    August that that particular posting was made.

9         Q.   Now, you said you weren't quite exactly sure,

10   would it possibly have been on August 9th of 2010?

11        A.   It could have been on August 9th.  When I

12   looked, it looked like the last login date was the

13   16th.

14        Q.   And how did you know that page belonged to Mr.

15   Russell?

16        A.   The picture on the page represented him, as

17   well as what he -- basically, the picture represented

18   him.

19        Q.   Now, after you had obtained and filed this

20   criminal complaint and affidavit with the Court, what

21   actions did you take to take Mr. Russell into custody on

22   the arrest warrant?

23        A.   Well, as is customary, there are several

24   things that you want to do to make sure that you

25   positively identify the individual.  First of all,

1    the -- Mr. Russell was identified by the victim and the

2    victim's mother as to the individual that the victim

3    traveled from Montana -- or from Oregon to Montana with.

4    They were able to obtain a driver's license.

5            I tried to obtain a criminal background check

6    and found Mr. Russell's name and date of birth, but I

7    did not find the Social Security number, which led me to

8    believe that it may not be the same subject.  So in that

9    particular case, I also got the help of the United

10   States Postal Inspector here to confirm Mr. Russell's

11   address, which was **(address redacted per request)**.  And

12   taking into account the comments about wanting to be

13   gunned down by cops, we ended up using a ruse and trying

14   to separate Mr. Russell from his home to take him into

15   custody.  We didn't want him to have any access possibly

16   to any weapons, didn't know if he had any weapons.  He

17   didn't have any work history that we were able to find,

18   and so we wanted to make sure that safety was the number

19   one priority, after making those particular comments.

20       **Q.   When you took him into custody, were you --**

21   **did you become aware whether there was any firearms**

22   **located in the residence where he was residing?**

23       A.   Yes.  His stepfather had a 9 millimeter that

24   was in a closet.

25       **Q.   Have you taken any other steps during your**

1    investigation to investigate any other illegal activity

2    that may have been engaged in by Mr. Russell that is not

3    indicated in the affidavit?

4        A.   Certainly.  As of yesterday, I received

5    notification from Jimmy Weg, who is the forensic analyst

6    for the State of Montana, that there are possibly

7    pictures of the victim that would constitute child

8    pornography on Mr. Russell's computer.

9        Q.   When you say "possibly," did you take any

10   steps to confirm whether those images did -- in fact

11   were images of the victim that we have been talking

12   about in this case?

13       A.   Yes.  We compared a -- basically a sterile

14   photograph that we received from the detective over in

15   Oregon, compared those to the picture of the female, the

16   underaged female that is on Mr. Russell's computer.  And

17   the background, as well as the facial features, match.

18   And then a phone call was also placed to the victim who

19   confirms that there will probably be pictures of herself

20   on Mr. Russell's computer.

21       Q.   And were those images created by Mr. Russell,

22   or were they created by someone else, or do you know?

23       A.   It appears that it was a webcam share, so the

24   victim would have been on webcam with Mr. Russell.

25   Mr. Russell was also webcamming with the victim.

1     Q.   And then those images, if I'm understanding
2   you correctly, were saved by Mr. Russell?
3     A.   That's correct.
4     Q.   Are you aware of whether this -- whether
5   Mr. Russell is originally from Helena, Montana?
6     A.   Uhm, yes.  I'm aware that he apparently grew
7   up in New York state and had traveled to Arizona prior
8   to moving to Helena about four and a half years ago.
9     Q.   Did you have an opportunity to interview the
10  Defendant's mother in this case?
11    A.   Yes.  I did talk to her the day that the
12  search warrant was served.
13    Q.   And what, if anything, did you learn from the
14  Defendant's mother about what had happened when -- let
15  me back up.  When the Defendant arrived here in Montana
16  with the victim, and as you described at the Shilo Inn,
17  what happened after that?
18    A.   The Defendant and the victim traveled to Mr.
19  Russell's home, and Mr. Russell's mother did meet the
20  victim.  And when the mother found out that -- according
21  to her -- she was 17, the -- Mr. Russell's mother
22  basically said we need to get the child back to the
23  parents in Oregon and basically took Mr. Russell and the
24  victim to the airport to where Mr. Russell paid for a
25  plane ticket via Horizon Airlines to get the female back

1    to Oregon.

2        Q.   Is there anything other -- any other

3    significant facts that you would like to add about your

4    investigation in this matter?

5        A.   Uhm, no, not to this particular point.

6             MR. WHITAKER:  I have no further

7        questions, Your Honor.

8             THE COURT:  Mr. Donahoe,

9        cross-examination.

10            MR. DONAHOE:  Thank you, Your Honor.

11

12                   CROSS-EXAMINATION

13   BY MR. DONAHOE:

14       Q.   Sir, is there any concern about kidnapping

15   here?

16       A.   Uhm, no, I don't believe that there is.

17       Q.   Okay.  So, if we could separate.  The coercion

18   and enticement complaint goes to the sex, doesn't it?

19       A.   That is correct.

20       Q.   All right.  So we could distinguish, then, for

21   our purposes, a difference between coercion or

22   compelling somebody to go with interstate and you are

23   not seeing any evidence of that here?

24       A.   Not that I'm aware of, no.

25       Q.   And isn't it true, sir, that the victim -- or

**＊＊＊＊＊＊**

*For The Record Reporting Services*
*(406) 498-3941*

1    maybe we could refer to her as AS, would that be okay?

2        A.   That's correct, yes.

3        Q.   All right.  So, AS was feuding with her mom

4    around the time of departure from the West Coast; isn't

5    that true?

6        A.   That is correct.

7        Q.   Yeah.  And she met up with Mr. Russell and

8    they apparently made this plan to come to Helena?

9        A.   That's correct.

10       Q.   Is that right?  And then, if I get this right,

11   as soon as mom found out, that would be Mr. Russell's

12   mom, immediate steps were taken to return the child, the

13   youngster to her mother.

14       A.   That's correct.

15       Q.   All right.  And then there was some follow-up

16   investigation there, correct?

17       A.   That is correct.

18       Q.   Now, is there a time difference, sir, between

19   those events and the return of AS to the West Coast and

20   your actually arresting Mr. Russell?

21       A.   There is.

22       Q.   All right.  Could you explain that?  And, I

23   mean, I'm sure you have that timeline in your head.

24       A.   Certainly, yes.

25       Q.   Yeah.

1      A.   From what happened is, is that the complaint

2   came in initially as a runaway.  When she was returned,

3   the runaway was dropped.  In March of this year is when

4   AS and her mother went to the police to talk about what

5   had happened, that the sexual relationship took place,

6   and then that was turned over to detectives, and it

7   wasn't until June when they contacted me for

8   assistance.

9      **Q.   All right.  Now, between those two beginning**

10  **and ending points, any investigation by you that shows**

11  **that this individual, Mr. Russell, engaged in any**

12  **criminal activity?**

13     A.   As far as?  Excuse me.  Can you repeat the

14  question again, please?

15     **Q.   Any investigation by you revealed between**

16  **those two dates, those perimeter dates that you just**

17  **laid out there, I think December and March, --**

18     A.   Correct.

19     **Q.   -- that Mr. Russell engaged in criminal**

20  **activity?**

21     A.   No.  The only one that I did was just to check

22  with the Shilo Inn here in Helena.  That was pretty much

23  it.

24     **Q.   All right.  So nothing of late, or at least**

25  **the down time, if we could call it that, between**

1   December of '09 and the investigation heating up again

2   in March of '10, nothing to suggest that he was

3   consistently engaged in criminal behavior?

4       A.   That's correct.  I did look for profiles that

5   were out on the Internet.  He has those marked private.

6   I wasn't able to see if there was anything, but I -- you

7   know, there was nothing that I noticed.

8       Q.   All right.  Now, if we could talk about the

9   website and the Facebook business.  Any on-the-ground

10  investigation by you that sort of supports the inference

11  that that was anything other than exaggeration?

12      A.   Other than there was no work history or we had

13  no information as a police department.  There was no

14  criminal history.  There was nothing else that we were

15  able to find.

16      Q.   Okay.  So, nothing in the way of actual

17  possession of firearms.

18      A.   No.  There was no history that he had any

19  concealed weapons permit, that he had purchased any

20  firearms, anything of that nature.

21      Q.   All right.  So it would appear that, at least

22  in terms of hard evidence -- let's put it this way.

23  Would your concern be heightened had you conducted the

24  search at the home and found a plethora or a volume of

25  weapons in the closet?

1    A.    Uhm, much more so, yes.

2        Q.    And if they were of an automatic nature, that

3    would really heighten your concern, wouldn't it?

4        A.    Correct.

5        Q.    All right.  So, if we work on that same scale,

6    the absence of that evidence is some suggestion that

7    this might be hyperbole here on the Internet?

8        A.    It could be, yes.

9        Q.    Okay.  Do you know why mom and AS were

10   feuding?

11       A.    I do not recall exactly what had taken place,

12   but I know that there was a feud.

13       Q.    All right.  In your interview with mom, Mr.

14   Russell's mom, and I think her name is Barbara Todd, --

15       A.    That's correct.

16       Q.    -- did you determine whether or not Mr.

17   Russell has employment?

18       A.    Yes, I did.

19       Q.    All right.  Could you tell Judge Holter about

20   that, please?

21       A.    Certainly.  Mr. Russell is working for his

22   mother over at Walmart and has been, I believe, for the

23   last four years, four and a half years.

24       Q.    All right.  So you did eventually nail down

25   that there was some consistency in employment for this

1    individual?

2         A.   That's correct.

3         Q.   All right.  Anything in the way of NCIC

4    reports, hits on -- from the Phoenix area suggesting

5    that there's any kind of felony conviction here?

6         A.   No.

7         Q.   Anything in the way of a misdemeanor

8    conviction here?

9         A.   No.

10        Q.   So, the long and the short of it is is that

11   these two individuals, Mr. Russell and AS, hooked up on

12   the Internet, he rolled out there, commenced a

13   relationship with her and brought her here?

14        A.   That's correct.

15        Q.   And she apparently traveled interstate

16   voluntarily.

17        A.   That's correct.

18        Q.   And, in fact, she was kind of pressured to go

19   home by Mr. Russell's mother?

20        A.   That's correct.

21        Q.   Anything since AS's return to Washington on

22   the airplane, for lack of a better phrase, of a sordid

23   nature between these two, Mr. Russell and AS?

24        A.   Yes.  There was stuff in February, uhm, and

25   those were the conversations that were commented about

1    where he wanted to preferably get gunned down by cops.

2    He was frustrated because the relationship had broken up

3    and basically talked about those types of things.  Those

4    were in February.

5        Q.   Okay.  But, I mean, any follow-up in terms of

6    him coming out there again, we should be together, that

7    sort of thing?

8        A.   He had made a comment in one of the chats

9    where he said that he had been out there many times,

10   even when they were having difficulties, said he knew

11   where she lived.  That was really about all the

12   conversation that was there.

13       Q.   All right.  So, apparently there was some

14   interest in maintaining the relationship on his end?

15       A.   Yes.

16       Q.   Did you ever determine whether that was true

17   for AS, as well?

18       A.   Uhm, yes.  And she did not want to -- in fact,

19   there was a conversation where Mr. Russell wanted some

20   things back that he had provided to her during the

21   course of the relationship.

22       Q.   All right.  Anything untypical about that in

23   this breakup other -- setting to one side the age

24   difference?

25       A.   Right.  No.

1        Q.   No.

2        A.   No.

3                MR. DONAHOE:  I don't have anything

4        further.  Thanks.

5                THE COURT:  Redirect, Counsel.

6                MR. WHITAKER:  Briefly, Your Honor.

7

8                   **REDIRECT EXAMINATION**

9    BY MR. WHITAKER:

10       Q.   Mr. Donahoe had asked you about firearms in

11   the house and about automatic weapons and whatnot, do

12   you recall that?

13       A.   I do.

14       Q.   Now, you had -- just so I'm clear, you had

15   talked -- you had talked about, in your direct

16   testimony, that there was a firearm that was found in

17   the house; is that right?

18       A.   That is correct.

19       Q.   Okay.  And was that a loaded firearm or was

20   there ammunition nearby?

21       A.   There was a box of ammunition, but I believe

22   the firearm was unloaded.

23       Q.   Okay.  Now, I just wanted to clarify your

24   testimony.  Mr. Donahoe had asked you about the coercion

25   -- whether there was any coercion or inducement or

1   persuasion into getting the victim, AS, to travel.  Is

2   it your testimony that there was or was not persuasion,

3   inducement or coercion used by Mr. Russell to get AS to

4   travel in interstate commerce to engage in sexual

5   intercourse?

6       A.   They basically talked about it, felt it was

7   good -- they talked about being able to go back to

8   Montana, and that's when the two decided to go.

9       Q.   And Mr. Russell talked to her using this

10  Internet communication?

11      A.   That's correct, webcam, text message,

12  cellphone.

13      Q.   Okay.  And Mr. Donahoe also asked you about

14  the My Space postings, the Internet posting that you

15  talked about, about it basically being a hit man, or

16  however you described that, that he was better than his

17  competition?

18      A.   That's correct.  If you wanted somebody dead

19  he was your man, and he was cheaper than most of his

20  competitors.

21      Q.   And you had indicated that possibly could just

22  be hyperbole, but you don't know for sure, do you, what

23  his thoughts and mind were when he posted that?

24      A.   No.

25      Q.   But how did you respond -- how did Helena

1  **Police Department respond to that posting?  What did you**

2  **do when you did the arrest?**

3       A.   At that particular point we knew that we

4  weren't just going to go and knock on the door fearing

5  that this could possibly turn out to be something very

6  dangerous.  Not knowing Mr. Russell, and not having had

7  any contact with him, and it's been my experience in the

8  past that sometimes in cases such as this, individuals,

9  when they are confronted with these types of crimes, can

10 react in an unpredictable way.

11      **Q.   And was your fear that he may act**

12 **unpredictably also enhanced by the chat that we**

13 **discussed where he had talked about not only committing**

14 **suicide but being gunned down by police officers?**

15      A.   That's correct.

16      **Q.   And so you, in fact, took that seriously, did**

17 **you not?**

18      A.   We did.  We felt that the ruse was the best

19 way to be able to separate him from the home.

20           MR. WHITAKER:  I have no further

21      questions.

22           THE COURT:  Thank you.  Step down,

23      please.  Do you have further witnesses?

24           MR. WHITAKER:  No further witnesses.

25           MR. DONAHOE:  The Defendant wish to

1        present anything at this point?

2                    MR. DONAHOE:  I did, Your Honor.  I'd

3        like to call Barbara Todd.

4                    CLERK OF COURT:  Right here, please.

5

6                    **BARBARA ANN TODD,**

7              **having been first duly sworn, testified under**

8    **oath as follows:**

9                    THE WITNESS:  Yes.

10                    CLERK OF COURT:  Please state your full

11        name and spell your last name.

12                    CLERK OF COURT:  Barbara Ann Todd,

13        T-O-D-D.

14                    THE WITNESS:  Go ahead and take a seat in

15        the witness stand and speak clearly into the

16        microphone.

17

18                    **DIRECT EXAMINATION**

19    **BY MR. DONAHOE:**

20        **Q.   Ma'am, could you tell us your name and your**

21    **occupation?**

22        A.   Barbara Ann Todd.  I'm a merchandiser for

23    Hallmark.

24        **Q.   All right.  Could you tell Judge Holter what**

25    **that actually is?  Are you a person that works for**

****** 

*For The Record Reporting Services*
*(406) 498-3941*

1    Walmart or a person that works for Hallmark?

2        A.    I work for Hallmark in Walmart.

3        Q.    Okay.

4        A.    We take care of the Hallmark department,

5    putting out cards, doing returns, setting things up for

6    seasons.

7        Q.    Are you related to Shawn Russell?

8        A.    I am his mother.

9        Q.    And prior to coming to Montana, where did you

10   and Shawn live?

11       A.    Phoenix, Arizona.

12       Q.    And how long did you live there?

13       A.    Since Shawn was born.

14       Q.    All right.  So he was born there?

15       A.    Yes, he was.

16       Q.    Now, can you give me some chronology here?

17   When did you come to Montana?

18       A.    We moved to Montana five years ago.

19       Q.    And did Shawn come with?

20       A.    Yes, he did.

21       Q.    And you had gone through a divorce and

22   apparently remarried?

23       A.    Yes, I did.

24       Q.    And came this way subsequent to that?

25       A.    Correct.

1      Q.   Was Shawn in continuous residence with you in

2  Phoenix?

3      A.   Yes, he was.

4      Q.   All right.  So he lived with mom and dad up

5  until the time that you guys came here?

6      A.   Yes, he did.

7      Q.   So when he was 19.  He's going to be about 24

8  in November?

9      A.   In November, yes.

10     Q.   Yeah.  Shawn came up and he's been in

11 continuous residence with you and your new husband

12 here?

13     A.   Correct.

14     Q.   And does Shawn have an occupation?

15     A.   Yes.

16     Q.   Is it connected to yours?

17     A.   Yes, it is.

18     Q.   Could you tell me about that?

19     A.   He is also a merchandiser.  I am his direct

20 supervisor, and he works with me for Hallmark at

21 Walmart.

22     Q.   Now, setting aside the fact that he's your

23 son, is he a person that the business needs?

24     A.   Yes, definitely.

25     Q.   Does he perform a valuable function?

1      A.   Yes, he does.

2      Q.   All right.  And has he been consistently on

3   the payroll?

4      A.   Yes.

5      Q.   Now, are you prepared to convince the Court of

6   that today?

7      A.   I have all of his paystubs to show that since

8   even the end of last year that he has been at work at

9   all of his scheduled hours.

10      Q.   All right.  So, if called upon to do so, you

11   could show that he's been in consistent employment with

12   the Hallmark organization?

13      A.   Yes.

14      Q.   With you as his direct supervisor?

15      A.   Yes.

16      Q.   Can you tell me what the duties are?

17      A.   He does the same as I do.  He works with the

18   customers, he puts up merchandise, he does returns,

19   receives shipments.

20      Q.   Has he been replaced on the job since he's

21   been incarcerated?

22      A.   No, he has not.

23      Q.   So you're holding his job for him?

24      A.   Yes, I am.

25      Q.   All right.  Hoping that he will be able to be

1   released today?

2        A.   Yes.

3        Q.   All right.  Now, if I could take you to when

4   Shawn showed up here in Montana with AS.

5        A.   Uh-huh.

6        Q.   What were your concerns?

7        A.   They walked in the door and she was scared and

8   shaking and I said, What's going on?

9        Q.   And had you met this individual prior to that

10  encounter?

11       A.   No, I had not.

12       Q.   You had never met AS before?

13       A.   No.

14       Q.   All right.  What did you do as a mom in that

15  situation?

16       A.   I asked them what was wrong.

17       Q.   All right.  And were they forthcoming?

18       A.   Yes.  Yes.

19       Q.   All right.  Tell me about that.

20       A.   Uhm, Shawn said there is a problem, and he

21  said -- he introduced me to the young lady.  And I said,

22  Well, what is the problem?  And she just looked at me

23  and said, I'm only 17, and I'm here from Oregon.  My

24  mother threw me out of the house, my father beats me, I

25  talked to Shawn about could he get me out of this

1    situation.

2        Q.   And how did you react to that?

3        A.   I was shocked and said, If you're 17, in my

4    eyes you're under age, we need to get you home.

5        Q.   All right.  So, not withstanding what seemed

6    to be personal domestic difficulties on AS's part, your

7    aim was to get this individual back to Washington?

8        A.   Correct.  I even gave her my cellphone to call

9    her mother to tell her that she was okay, and she did

10   not want to call her mother.

11       Q.   All right.  But you forced that issue?

12       A.   Yes.

13       Q.   All right.  So what's the outcome there, what

14   happens?

15       A.   We got into the car.  And I didn't even call

16   the airlines, I wanted her out of my home.  Got her into

17   the car, we went to the airport where we found out when

18   the next flight was leaving for her to go back to

19   Oregon.

20       Q.   All right.  And did you make sure she got

21   passage on the next flight?

22       A.   I stood right there with them both the whole

23   time.

24       Q.   All right.

25       A.   Until she got on the plane.

1      Q.   So, AS departed and you haven't seen her

2   since?

3      A.   Correct.

4      Q.   All right.  Did Shawn go back to work?

5      A.   Yes, he did.

6      Q.   And did you discuss the matter further with

7   him?

8      A.   We -- yes, we did.  We talked about it.

9      Q.   All right.  Any resolution there?  Or, I mean,

10  were you concerned as his mother?

11     A.   As far as what could --

12     Q.   Well, that -- I guess given the whole

13  situation.

14     A.   Yes, I was.  I didn't know what was going to

15  come of this.  I was concerned for the girl's safety.

16  After what she had told me what her relationship was

17  with her mother and her father I didn't know what was

18  going to happen to her.  I was concerned that neither

19  parent was going to meet her at the airport, that they

20  were sending a sister.

21     Q.   Okay.  So, all around, I guess on everyone's

22  part, you had concerns about how judgments were

23  exercised?

24     A.   Correct.

25     Q.   To include your son's?

1          A.    Yes.

2          Q.    All right.  Did things, for lack of a better

3     phrase, calm down after that?

4          A.    In our home?

5          Q.    Yes, ma'am.

6          A.    Yes.

7          Q.    All right.  And you got back to routines?

8          A.    Yes.

9          Q.    Shawn went back to work?

10         A.    Yes.

11         Q.    He consistently showed up?

12         A.    Correct.

13         Q.    All right.  Any other problems you've had with

14    this boy in raising him?

15         A.    No.

16         Q.    I mean, in a big way?  All families have

17    issues, but...

18         A.    No.

19         Q.    Anything like this ever happened to you

20    before?

21         A.    No.

22         Q.    No.  Do you feel, under the circumstances, you

23    took appropriate action?

24         A.    I believe I did.

25         Q.    You satisfied with that?

```
 1         A.   Yes, I am.
 2         Q.   You remonstrated with your son, you took him
 3    to task and told him --
 4         A.   Oh, definitely.
 5         Q.   All right.  Now, do you need him back at
 6    work?
 7         A.   I most certainly do.
 8         Q.   There's a thing in release law called
 9    third-party custodian where you could take
10    responsibility for Shawn.  Are you willing to do that?
11         A.   Yes, I am.
12         Q.   Monitor his movements?
13         A.   Yes.
14         Q.   Report them to the Court if he violates
15    certain conditions?
16         A.   Yes.
17         Q.   All right.  Would it be your request that you
18    serve as that third-party custodian here?
19         A.   Yes.
20         Q.   Are you confident that Shawn can abide by all
21    the conditions?
22         A.   Oh, yes.
23         Q.   All right.  What about the firearms issue in
24    your home?  Any unwillingness on your part to get that
25    firearm out of the house, if necessary?
```

1    A.    No, not at all.

2    Q.    All right.  You could do that?

3    A.    That's fine.

4    Q.    All right.  Is -- on that subject of firearms,

5    is Shawn a firearms person?

6    A.    No.

7    Q.    No.  He's not really a gun aficionado, is

8    he?

9    A.    No.  As a matter of fact, when my husband's

10   parents come to visit us, his family is and he has taken

11   -- they have taken Shawn with them to the sporting goods

12   store because they are into guns and whatnot.  And Shawn

13   likes spending time with his grandfather and his uncles,

14   but to actually be there looking at guns, he's not

15   interested at all.

16   Q.    Okay.  So no real interest there.  Have you

17   been present in court for the discussion about -- from

18   the witness stand about the Facebook page and the

19   websites and so on?

20   A.    Yes.

21   Q.    All right.  Do you have any opinion on that

22   stuff?

23   A.    No, I don't, because I haven't seen them.

24   Q.    All right.  Would it appear to you that these

25   are exaggerations by your son?

1       A.   Yes.

2       Q.   Any behavior that you've noticed consistent

3  with such talk assuming, just for sake of discussion,

4  that it were true?

5       A.   Not at all.  That's -- to me it's -- I've seen

6  postings of other people that I know, and basically

7  shooting their mouth off on their pages is what it ends

8  up being.

9       Q.   All right.  Would you be okay with Internet

10  restrictions for the boy were he released by Judge

11  Holter?

12      A.   Of course.

13      Q.   Okay.  And you would be willing to report

14  those if those conditions were violated?

15      A.   Yes, I would.

16           MR. DONAHOE:  I have nothing further,

17      Your Honor.

18           THE COURT:  Cross-examination.

19

20                 CROSS-EXAMINATION

21  BY MR. WHITAKER:

22      Q.   Good morning, ma'am.

23      A.   Good morning.

24      Q.   Now, you mentioned that Shawn works for you at

25  Hallmark?

1        A.   Correct.

2        Q.   **How many hours a week does he work there?**

3        A.   It depends.  During the summer our hours are

4   cut considerably because there aren't any holidays.

5   Right now it's going to start picking up because we are

6   going to start gearing up for the season, which is from

7   Halloween until graduation and Father's Day in June.

8        Q.   **So, can you give me an idea, say, during your**

9   **busy season on an average how many hours a week would he**

10  **work.**

11       A.   Somewhere between maybe 25 and 30, depending

12  on like -- especially like the week before Christmas and

13  Valentine's Day and Mother's Day when we have to be in

14  the store two and three times a day to keep replenishing

15  the cards.

16       Q.   **And during the slow season, like this -- as**

17  **you described, the summertime, how many hours a week**

18  **does he work?**

19       A.   Maybe 20, 20-ish.  15, 20.

20       Q.   **And what is -- so even at the busy season, the**

21  **busy season maybe the max he's working about 30 hours a**

22  **week?**

23       A.   It's hard to say.  It depends on what Hallmark

24  sends us for that season how many hours they want us to

25  work.

1    Q.   Okay.  But you said maybe around 25 to 30.

2    A.   When it's busy between, like I said before,

3    Christmas, and it could be up to 40 hours.  Again, it

4    depends on what Hallmark tells us they want us in the

5    store.  I have no control over that.

6    Q.   Okay.  So what does Shawn do in his free time

7    that he's not working?  Because he's not working

8    full-time, right?

9    A.   Correct.

10   Q.   So what does he do in his spare time when he's

11   not working?

12   A.   Watches TV, listens to music.  He's on his

13   computer, plays games on his computer with his

14   friends.

15   Q.   Now, you had talked with Agent Fischer; is

16   that right?

17   A.   Correct.

18   Q.   And you had mentioned to Agent Fischer that

19   Shawn doesn't have a lot of friends here in Montana; is

20   that right?

21   A.   Correct.

22   Q.   And that was a concern for you, that he

23   doesn't have a lot of friends, he doesn't have a lot to

24   do here in Montana.

25   A.   It was a concern for me that there is not a

1    lot of things available to young men in Shawn's age

2    group outside of going to bars.

3         Q.    Does Shawn go to bars?

4         A.    No, he does not.

5         Q.    So basically, in his free time he just kind of

6    watches TV and plays games on his computer and things

7    like that to kind of keep himself occupied?

8         A.    Correct.

9         Q.    Okay.  Now, you had mentioned that you have

10   been divorced and are remarried?

11        A.    Correct.

12        Q.    Where does Shawn's real father live?

13        A.    I believe he's still in Phoenix, Arizona, but

14   I don't know.

15        Q.    Does Shawn have any contact with him?

16        A.    To my knowledge, no.

17        Q.    Now, I want to turn your attention to the time

18   when Shawn and AS, the victim, showed up at your house,

19   and you said that this young girl was talking about how

20   abusive her home was.  Is that correct?

21        A.    Correct.

22        Q.    And you said that that was a real concern for

23   you.

24        A.    Correct.

25        Q.    And, in fact, you were -- you said I got to

1    get her immediately out of my house; is that right?

2         A.   Correct.

3         Q.   And you immediately went to the airport.

4         A.   She may have been in my home about 10 to 15

5    minutes before we left.

6         Q.   Okay.  But it was a really -- it was a concern

7    for you that what she was telling you about, that her

8    father beat her and that she was in this abusive home?

9         A.   Correct.

10        Q.   And your decision was to take her to the

11   airport and send her back; is that right?

12        A.   Correct.

13        Q.   Did you have any concern for her safety in

14   sending her back?

15        A.   I did, until I found out when I heard -- when

16   I talked to her mother on the phone that the sister was

17   picking her up, that she said she was not going directly

18   home.  Her -- one of her older sisters was picking her

19   up at the airport.

20        Q.   And did you have any thought to -- if you were

21   concerned for her safety at home and she -- and it was

22   your understanding that she had run away from that, did

23   you have any thought to call the police and let them

24   know about the situation?

25        A.   According to her father, a conversation that I

1  heard Shawn and her father had on Shawn's cellphone with

2  the speaker phone on, the father had reported her as a

3  runaway, he had told Shawn she is on her way to you.

4  Shawn said, she is here and we are putting her on the

5  plane right now, and her father said fine.

6      Q.   And -- but as far as for you, you testified

7  that you were concerned for her safety in sending her

8  back, and that's why she left, and she came here because

9  she was allegedly being beaten is what she told you.

10     A.   Correct.

11     Q.   You didn't independently call the police or

12 let any of the authorities know that perhaps you're

13 sending a child back to an abusive home, that perhaps --

14 and you talked to the father, obviously, like you said,

15 but you had no indication or thought to call the police

16 and say I may be sending a child back to an abusive home

17 where she is getting beaten?

18     A.   No, I did not.  I did not think of that.

19     Q.   When you were interviewed by Agent Fischer,

20 you had also indicated that you knew Shawn was engaged

21 in sexual activity with this person that he had gone to

22 pick up from Oregon?

23     A.   No, I did not.

24     Q.   Did you know that Shawn had gone to Oregon?

25     A.   I knew once he had gotten to Oregon.  He

1    called me to let me know that he was in Oregon.

2         Q.    And do you know why he went to Oregon?

3         A.    No, I do not.

4         Q.    Why did he tell you he was in Oregon?

5         A.    He said he needed to take some time off from

6    work, that he was going to take a trip and he wanted to

7    go to Oregon.

8         Q.    And so he called you to let you know that he

9    arrived in Oregon?

10        A.    That he was safe.

11        Q.    And at any point did you know that he was

12   engaged in any type of sexual activity, whether in

13   Oregon, Washington, or at the Shilo Inn here in

14   Montana?

15        A.    No.

16        Q.    You had no idea that he was with -- did you

17   know if he was with anybody during that time?

18        A.    I did not know.

19        Q.    So the very first time you learned that Shawn

20   was with AS, the victim, was when they showed up at your

21   house.

22        A.    Correct.

23        Q.    So you had no ability to control Shawn or his

24   actions or what he was engaged in in December with AS?

25        A.    No.  He's an adult.  If he was 17 years old I

1     would have, but being 23, no.

2          Q.   And you also testified that you have never

3     seen the Facebook page; is that right?

4          A.   Correct.

5          Q.   And I'm guessing probably for the same reason,

6     because he's an adult and you don't monitor those kind

7     of things now because he's an adult?

8          A.   I wouldn't have even -- I didn't even know if

9     he had a Facebook page or not.

10               MR. WHITAKER:  Okay.  No further

11          questions, Your Honor.

12               THE COURT:  Thank you.  Redirect.

13               MR. DONAHOE:  I have nothing.  Thanks,

14          Judge.

15               THE COURT:  Step down, please.  Call your

16          next witness, please.

17               MR. DONAHOE:  I have no other witnesses.

18          Thank you.

19               THE COURT:  The Government going to offer

20          any rebuttal?

21               MR. WHITAKER:  No rebuttal, Your Honor.

22               THE COURT:  Okay.  Out of an abundance of

23          caution I'm going to say we've now heard the

24          preliminary examination, and we'll immediately turn

25          to the question of detention.  I have received a

1      pretrial services report.  Have Counsel had the

2      right to look at it?  Have you seen it?

3               MR. DONAHOE:  I've not seen it, Your

4      Honor.

5               MR. WHITAKER:  I've not seen it either,

6      Your Honor.

7               THE COURT:  Would the pretrial services

8      office have a copy to show?  I've been supplied a

9      copy.

10              MR. WALLER:  I did provide them with

11     copies, Your Honor.  I can run down and run a

12     couple extra copies.

13              THE COURT:  Would the clerk please hand

14     this to Counsel?  Would you hand this to them?

15              MR. WHITAKER:  Thank you, Your Honor.

16              THE COURT:  Does Government wish to stand

17     on this pretrial services report or do you wish to

18     submit additional evidence in addition to what I've

19     heard already?

20              MR. WHITAKER:  I think the Government,

21     through the testimony that's already been provided,

22     has given the Court --

23              THE COURT:  You're adopting that for the

24     purposes of the detention hearing, for the

25     detention part of this hearing; is that correct?

1          MR. WHITAKER:  Yeah, that's correct.

2          THE COURT:  Okay.  Mr. Donahoe?

3          MR. DONAHOE:  I don't have anything

4     beyond what the Court has heard.

5          THE COURT:  Okay.  The Court determines

6     that, from the evidence produced, that there is

7     probable cause to believe that Shawn Matthew

8     Russell was in the state of Montana, in the

9     District of Montana, from September 2009 to

10    December 2009, and that the Defendant, using a

11    facility and means of interstate commerce,

12    knowingly persuaded and induced, enticed, and

13    coerced an individual here known simply as -- I

14    wrote the initials down, but the victim, I'm going

15    to call her "the victim," was a person who had not

16    attained the age of 18 years, to engage in sexual

17    activity without the consent of the person at that

18    time, that person being of the age of 16 years.

19          As to Count II, I determine that in

20    December of 2009 in Helena, in the state and

21    district of Montana and elsewhere, including the

22    States of Oregon and Washington, and the Court

23    notices that probably the state of Idaho was

24    involved because of the transportation across the

25    state of Idaho, that the Defendant, Shawn

1    Russell -- Shawn Matthew Russell knowingly

2    transported an individual who had not attained the

3    age of 18 years in interstate and foreign commerce

4    with the intent that that person engaged in sexual

5    activity for which that person could be charged

6    under the Montana Codes, sexual intercourse without

7    consent, and in violation of 18 U.S.C. 2423(a).

8            As to Count III, the Court determines

9    that sufficient evidence exists to establish

10   probable cause that in December 2009, in Helena, in

11   the state of Montana and elsewhere, including

12   Oregon and Washington, the Defendant, Shawn Russell

13   traveled -- Shawn Matthew Russell traveled in

14   interstate commerce for the purpose of engaging in

15   illicit sexual conduct, that is sexual intercourse

16   without consent, in violation of the Montana Codes

17   and the United States Codes, that probable cause

18   attaches to all of these charges.

19           Let me explain to you, Mr. Russell, that

20   probable cause simply means that the Court has

21   determined that sufficient cause exists in the

22   facts to establish a prima facie case against you

23   at this point as the Court views it.  This does not

24   mean in any way that you've been found guilty of

25   these offenses, it simply means that probable cause

1     has been established.  This matter will be
2     presented, I'm sure, Counsel, to the Grand Jury,
3     and they will make a final determination of
4     probable cause, and if they find probable cause,
5     will issue what is called an indictment charging
6     you with offenses as the Grand Jury determines they
7     exist.
8              As to pretrial detention, first of all,
9     I've now determined that probable cause exists on
10    each of the three counts that you're charged with.
11    Probable cause having been determined, the Court
12    notes that under the Bail Reform Act the offenses
13    with which you're charged trigger the statute and
14    -- under that -- under the Bail Reform Act, you can
15    be detained if the Court determines that you should
16    be, and that I now have determined probable cause.
17    I note that you have made threats.  First of all,
18    the charges are such that you would be -- could be
19    held anyway, but your additional threats of harm to
20    yourself or to your community compels the Court to
21    determine that you do pose a danger to the
22    community.
23              Further, in the light of the charges
24    against you, and the fact that I note that you
25    traveled interstate, you do not really have great

1          connections with this community.  You work

2          part-time.  You seem to not be employed except at

3          that part-time.  You spend your time essentially

4          doing nothing.  And, in fact, if you can easily

5          travel, it makes me feel that you are a flight

6          risk, and that's kind of what this statement that

7          you made, both on Facebook and otherwise, of being

8          ready, willing and able to cause harm to other

9          people, all of this, as I said, compels the feeling

10         that I must detain you awaiting trial.

11               This matter will be presented to the

12         Grand Jury, you'll be arraigned on the charges from

13         the Grand Jury.  You will have a copy of those that

14         will be supplied to you.  I cannot set a trial date

15         until after the Grand Jury has met and determined

16         what the charges against you might be.  As soon as

17         that happens, you will be arraigned and a Judge

18         will set a trial.

19               Is there anything further?

20               MR. WHITAKER:  Nothing further from the

21         Government.

22               THE COURT:  Okay.  We are in recess.

23               THE BAILIFF:  All rise.

24

25               **(The proceedings concluded at 10:41 a.m.)**

**\* \* \* \* \* \***

*For The Record Reporting Services*
*(406) 498-3941*

| | |
|---|---|
| 1 | <u>**CERTIFICATE**</u> |
| 2 | STATE OF MONTANA           } |
| |                     } ss: |
| 3 | COUNTY OF  BUTTE-SILVER BOW   } |
| 4 | |
| 5 |         I, Julie L. Sampson, Professional |
| 6 | Court Reporter, a notary public in and for the |
| 7 | aforesaid county and state, do hereby certify that: |
| 8 |         I am a duly-appointed, qualified |
| 9 | Court Reporter; that I reported all of the |
| 10 | foregoing proceedings had in the above-entitled |
| 11 | action, and the foregoing transcript contains a |
| 12 | full, true, and correct transcript of the said |
| 13 | proceedings to the best of my ability. |
| 14 |         IN WITNESS WHEREOF, I have hereunto set |
| 15 | my hand this 6th day of October, 2010. |
| 16 | |
| 17 |         /s/ Julie Sampson |
| | Julie L. Sampson |
| | Court Reporter |
| 18 | |
| 19 | |
| 20 |         /s/ Julie Sampson |
| | **(SEAL)** Julie L. Sampson |
| 21 | Notary Public for the State of Montana |
| | Residing at Butte, Montana |
| 22 | My Commission Expires July 10, 2014 |
| 23 | |
| 24 | |
| 25 | |